

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

No. 08-26-00083-CV

---

In the Interest of C.J.C., O.C.C. and V.A.R.C., Children

---

On Appeal from the 143rd District Court
Ward County, Texas
Trial Court No. 24-10-26678-CVW

---

## MEMORANDUM OPINION

Mother[1] appeals from the trial court's judgment terminating her parental rights as to her children C.J.C., O.C.C., and V.A.R.C., and appointing Appellee, the Texas Department of Family and Protective Services (the Department), as permanent managing conservator of her children based on the endangering conduct and endangering environment grounds as well as the children's best interest. Tex. Fam. Code §§ 161.001(b)(1)(D), (E). Mother challenges the legal and factual

---

[1] To protect the privacy of the parties, we refer to them by pseudonyms or their initials. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8(a), (b)(2).

sufficiency of the evidence to support termination under all of the findings. For the following reasons, we affirm the trial court's judgment.

## I. PROCEDURAL BACKGROUND

On October 17, 2024, the Department filed its original petition for termination. A bench trial was held before an associate judge on September 25, 2025. The associate judge heard testimony from Cidney Leos, the CPS caseworker; Esmeralda Bustamante, a Department Investigator; Heather Dunn, the court-appointed special advocate for the children (the CASA); Mother; Father; and S.P., the children's foster mom. The associate judge found that the Department had proven by clear and convincing evidence that (1) Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, pursuant to § 161.001(b)(1)(D); (2) Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, pursuant to § 161.001(b)(1)(E); and (3) it was in the best interest of the children to terminate Mother's rights.[2] Mother timely requested a de novo hearing.[3]

The district court held the de novo hearing on January 12 and February 4, 2026. It considered the record from the September 25, 2025 trial and heard additional evidence introduced at the de novo hearing by Mother, Father, and the attorney ad litem for the children. *See* Tex. Fam. Code § 201.015(c). At the de novo hearing, testimony was presented from Leos; the CASA; Mother; Father; C.S., the children's maternal grandmother; and M.G., Mother's boyfriend. Neither Bustamante nor S.P. testified at the de novo hearing. At the conclusion of the hearing, the district

---

[2] The trial court also terminated Father's parental rights.

[3] Although Father also timely requested a de novo hearing, he did not appeal to this Court.

court found that the Department had proven the D and E grounds by clear and convincing evidence and that it was in the best interest of the children to terminate Mother's rights. On February 6, 2026, the district court entered its order terminating Mother's parental rights to all three children. Mother appealed.

## II. Evidence and Testimony

Because the district court considered the transcript of the September 2025 trial and additional testimony at the de novo hearing, we summarize them together.[4]

### A. Events leading to removal

In September and October 2024, the Department became involved with the family upon being informed of allegations of medical neglect and physical abuse. On September 24, 2024, the Department received an allegation that V.A.R.C., who was four weeks old at the time, was released from the NICU and the parents had not followed up with a pediatrician. At the September trial, the Department questioned mother about an incident that occurred on October 13, 2024, when the police were called to the family's home and Mother initially indicated that Father struck her while she was holding her infant daughter. Mother testified that she recalled the incident but denied that she was holding V.A.R.C. or that V.A.R.C. was in the home at the time of the incident. On October 15, 2024, the Department received reports that O.C.C. had been observed with bruising on the bridge of his nose and both eye sockets.

Sharlotte Wright was the original Department investigator assigned to the case and did not testify at the September trial or the de novo hearing. Esmeralda Bustamante testified that she took over the investigation from Wright and visited the family's home to assess the children and discuss

---

[4] The Family Code provides that "[t]he referring court may also consider the record from the hearing before the associate judge." Tex. Fam. Code § 201.015(c).

3

the domestic violence allegations with Mother. At the time, the family was living in HUD housing, which Bustamante observed to be in an "appropriate" condition. She observed only the living room area and did not observe any safety hazards at the time. When questioned about O.C.C.'s injuries, Mother told Bustamante that he had "face-planted" on the tile floor in their home. Bustamante testified that Mother provided her with a different account of the injuries than she provided to Wright the day before. When Bustamante pointed out the inconsistencies in Mother's story, Bustamante testified that Mother became upset and indicated that she no longer wanted to cooperate with the Department. Throughout the conversation, Mother denied that there was any family violence in the home.

At some point during her conversation with Mother, Father returned to the home and became irritated and verbally aggressive toward Bustamante while the children were in the home, stating "If you think I can become violent, I will show you how violent I can be." Mother continued to deny any domestic violence. Bustamante attempted to discuss a safety plan or a child safety placement, but neither parent was cooperative. Based on the totality of the circumstances—including the inconsistent statements about O.C.C.'s injuries and the lack of acknowledgement of the domestic violence in the home—the Department decided to remove the children. The Department removed the children on October 16, 2024.

### B. The children's condition at removal

Bustamante testified as follows about the condition of the children at the time of removal. V.A.R.C., who was eight weeks old at the time, was "soiled to the max." She had "a significant amount of feces and urine" overflowing from the sides of her diaper. Bustamante observed a red mark across V.A.R.C.'s body "like a seatbelt had been too tight around her." In addition to the

4

facial injuries, O.C.C. was also wearing an "overly soiled" diaper with urine and feces. Bustamante testified to her concern that the children had not been tended to in some time.

Leos, the children's caseworker, testified that V.A.R.C. was diagnosed with "failure to thrive," was underweight, and lacked normal mobility at the time she came into the Department's custody. Leos attempted to discuss V.A.R.C.'s failure to thrive with the parents. According to Leos, Mother explained that V.A.R.C.'s condition stemmed from being born early. Father separately testified that V.A.R.C. was taken to the NICU immediately after she was born. During his testimony, Father indicated that she was discharged from the NICU but "was still having trouble," which prompted them to have her readmitted. Leos testified that she attempted to discuss with Mother her alleged failure to follow up with a pediatrician after V.A.R.C. was discharged from the NICU, and Mother explained that she was in the process of trying to follow up when the Department removed the children. According to Leos, Mother indicated that she did not understand V.A.R.C.'s failure to thrive because V.A.R.C. had been in the hospital and Mother figured that "she was fine with them."

Leos also observed bruising on O.C.C.'s face, which had begun to heal by the time she was involved in the case. When Leos questioned Mother about O.C.C.'s injuries, Mother told Leos that O.C.C. was playing with his siblings outside, pushing V.A.R.C. in a stroller when he tripped and fell on the sidewalk. At trial, Mother testified that "[O.C.C.] and [C.J.C. were] in the living room playing. And [O.C.C.] was in the hallway, and I was in the hallway too. And [C.J.C] and them was dancing and watching TV and stuff, and they were, like playing in the living room. So [O.C.C.] tripped over the couch and hit his face on the floor." Father testified that O.C.C. was running toward C.J.C. when he tripped and fell on his face, landing on the tile floor in the home.

Neither Bustamante nor Leos testified to C.J.C.'s injuries.

5

**C. Service plan**

Leos testified that she worked with Mother to create a family service plan, which required Mother to maintain a safe, stable, and functional home; obtain stable employment; participate in visitation; attend parenting classes; participate in individual counseling; submit to a psychological evaluation; submit to drug and alcohol testing; and participate in domestic violence victim's services classes. The Court adopted the service plan, ordering Mother to complete it. According to Leos, that Mother completed parenting classes, a psychological evaluation, and the victim's services classes before the September trial. In addition, Mother's drug and alcohol tests were negative during the pendency of the case. Mother began, but did not complete, individual counseling before the September trial.

According to Leos, Mother's employment history was "very sporadic" throughout the case. However, at the time of the September trial, Mother had been employed for three months at a local restaurant. At the de novo hearing in February, Mother testified that she was still employed by the same restaurant and earned $700–$800 every two weeks.

Leos testified that Mother struggled to maintain a safe, stable, and functional home, and struggled with visitation. The Department, without an additional court-ordered service plan, asked her to repeat her parenting classes, repeat her domestic violence victim's services classes, and obtain an MHMR exam before the September trial.

**D. Mother's housing**

Leos testified that Department policy requires her to visit the family at home at least once a month. When the case was opened in October 2024, the family was living in HUD housing that appeared empty—as if they were in the process of moving. Leos described the HUD housing as an appropriate home for the children. After removal, Mother and Father immediately relocated to

a home with some of Father's immediate family members. Leos testified that the home was not safe, clean, or appropriate for the children. She described the home as dirty, filled with alcohol, cigarettes, and cigarette butts everywhere, and having holes in the walls and floors, exposed wires, and stray animals inside the home. Additionally, Leos testified that the rooms were not set up for the children, the home lacked running water, and it had very little food. During her testimony at the September hearing, Mother acknowledged that the home was not safe for the children.

Leos testified that Mother and Father left that home and moved to the Austin area where they stayed for a month before returning. A few weeks later, Mother and Father moved to an RV, where Mother resided at the time of the September trial and the de novo hearing. According to Leos, throughout the case, Mother failed to acknowledge the safety and cleanliness issues in the various homes until immediately before the September trial. In response, Mother repeatedly told Leos that she and Father were working on the conditions and trying. Yet, Leos stated that "month after month, the conditions of the home remained the same."

Leos testified about the condition of Mother's RV at the September trial and at the de novo hearing. Leos did not see a change in the conditions of the home until the Tuesday before the September trial, at which time the RV appeared organized, clean, and safe. The CASA testified that she had safety concerns regarding the walls of the RV, which were peeling. At the de novo hearing, Mother introduced photos of the RV as proof that she had made improvements and addressed Leos's and the CASA's safety concerns. The CASA reviewed the photos and testified that her safety concerns were not visible in the photos. She also testified that she was unable to say with certainty whether the photos were of the same RV where Mother resided prior to the September trial. When asked whether Leos was able to tell if the photographs were a safe environment, she responded that the RV looked clean and in "better condition than [she had seen]

throughout the entire case," but that she was unable to conclude that the RV was safe because "cleanliness does not equate [to] safety."

### E. Visitation

The children were placed together with a foster family near Dallas, in part, because no appropriate immediate relatives were available for placement. The drive from Mother's home to the visitation center is between seven and eight hours. According to Leos, the typical visitation schedule consists of weekly in-person visitation. Originally, Mother and Father attended court-ordered in-person visitation once a week. However, Leos testified that, due to the significant distance and travel required, all parties agreed to change the visitation schedule from weekly to biweekly. Mother and Father were adamant that they could attend biweekly in-person and virtual visitation. At the September trial, Leos testified that visitation was "sporadic" and that the parents frequently cancelled or requested virtual visitation for various reasons, such as work or vehicle trouble.

At the September trial, Leos testified that the last in-person visit was on July 11, and the last virtual visit was on May 2. Leos testified that when Mother did attend visits, she struggled to care for the children consistently. For example, Mother remembered to bring food for the oldest child but frequently forgot formula and diapers for the youngest. This behavior concerned Leos, revealing that Mother was unable to demonstrate that she learned from the parenting classes.

Although Mother requested virtual visits between July 11 and the September trial, the Department did not approve the request as it did not consider virtual visits to be substantial enough for children of their age to interact with or maintain a bond with Mother. One problem Leos identified was the difficulty in requiring three young children under four years old to sit and participate in a two-hour visitation call. Another problem Leos identified at the time of the

September trial was the children's lack of verbal communication: C.J.C., the only verbal child of the three, did not speak clearly; V.A.R.C. and O.C.C. did not speak. Mother testified that during her virtual visits, the children were happy and would speak to her. Because Mother's rights were terminated after the September trial, there were no additional visits before the de novo hearing.

### F. Domestic violence

When questioned about domestic violence in the home, Mother initially denied all allegations. Eventually, through many conversations, Mother told Leos that Father struggled with his mental health and frequently drank alcohol. She admitted that their arguments often escalated and that neighbors had called law enforcement for welfare checks and to report disturbances.

At the September trial, Mother admitted that there was domestic violence in her home when she lived with Father. According to Mother, the first time Father assaulted her was in "like 2020" or when C.J.C. was one-year old. Mother testified that she filed a police report and that Father was arrested after the first incident, but she never obtained a protective order. She admitted that the assaults continued after the birth of each child. Throughout her testimony, Mother identified other incidents of domestic violence. One incident occurred in September 2024, when Father was drunk and threatened to kill her, but she maintained that he did not "hit [her] at that time." Another occurred in October 2024, when she said that Father struck her, but she insisted that none of the children were home at the time. Mother testified that she considered Father a danger to her and the children during their entire relationship, stating "I knew that would impact my children and felt like that wouldn't be safe for them."

Father denied domestic violence or physical abuse in the home but did admit struggling with alcoholism. He testified that he and mother had "too many confrontations" that often "escalated" to the point that law enforcement was called. Although he denied any physical

9

violence, he testified that the relationship included verbal violence, which he believed was just as bad as physical violence. Father continued to consume alcohol and test positive for cocaine, amphetamine, and methamphetamine throughout the case. He denied doing drugs around Mother and the children. At the de novo hearing, Father testified that he had been attending an addiction program for eight or nine years without success.

Father described their relationship as "toxic," and Mother acknowledged that their relationship "had problems." At the September trial, Mother testified that she originally wanted to make things work with Father, but she ultimately decided that she needed to end the relationship "because it wasn't a safe environment for [her] children."

Father testified that during the case, Mother had multiple affairs with other men. Mother notified Leos on August 12th or 14th that she and Father were no longer together (although in her testimony, she confirmed that they were still married at the time). A few days later, Mother contacted Leos again to let her know that she had a new boyfriend (M.G.). At the de novo hearing, Mother testified that she began her relationship with M.G. a week after leaving Father. Leos looked into M.G.'s background and discovered that he had a history of domestic violence. At that time, Leos recommended that Mother restart the domestic violence victim's services classes and parenting classes. When asked why the Department wanted Mother to restart the classes, Leos responded that throughout the case, Mother was unable to demonstrate that she had learned from the classes or that she had developed the skills necessary to make appropriate choices about the people around her children.

At the September trial, the Department questioned Mother about her new relationship. Mother acknowledged that M.G.'s history of domestic violence was a problem. She denied that M.G. lived with her in the RV but acknowledged that he frequently spends two weeks at a time

with her in Monahans, staying the nights in the RV, before returning to his home in Pecos. Leos confirmed that Mother had denied living with M.G. but also testified that M.G. was at the RV with Mother when she visited the home, including the Tuesday before the September trial. She also testified that M.G. did not have his own vehicle.

At the September trial, Mother testified that if the children were returned to her, M.G. would not continue to spend the night with her because the children were her priority. When asked if she would end the relationship with M.G. if her children were returned, Mother responded "Yes, sir. I would." Father testified that he believed Mother to be "a good mom" but that he did not know anything about M.G.

In February, at the de novo hearing, Mother testified that she was still dating M.G. and was pregnant with his child. She then testified that she planned to stay with M.G. and denied that he was living with her in the RV. M.G. testified that he had been convicted of assault family violence, furnishing alcohol to a minor, theft, unauthorized use of a vehicle, burglary of a vehicle, and "a number of various offenses," and was currently on parole. M.G. testified that he received a sentence of four years' incarceration for the assault family violence charge, of which he served two years, having gotten out in April 2025, and that he took domestic violence classes. At the de novo hearing, Mother testified that the Department wanted her to redo her parenting classes and domestic violence victim's services in part because of her relationship with M.G., stating "It was because [the Department] wanted me to not be in the same situation I was leaving."

The CASA testified to her serious concern for the children's safety due to Mother's relationship with M.G., given his family violence conviction. The CASA had at least three conversations with Mother about whether continuing the relationship was in the best interest of the children.

11

Mother testified both that she did not think that Father was a safe or appropriate person for the children because of his history of family violence and that she thought M.G. was a safe and appropriate person for the children despite M.G.'s history. Mother stated that she had no concerns for the children in regard to M.G.'s criminal history and had not experienced any domestic violence in their relationship.

### G. Mother's support system

Mother did not have a working vehicle at the time of the September trial, but at the de novo hearing, she testified that she had a vehicle that was "almost up and running." She testified that a family friend was willing to transport her to doctor's appointments, visitation, school, and other places and that her mother, uncle, several friends, and M.G. were willing to help her with the children. C.S., the children's maternal grandmother, testified at the de novo hearing that she was incarcerated for six months, until September 17, 2025, for violating her probation for manufacturing and delivery. C.S. stated that she was available to help Mother with childcare, and she believed returning the children to Mother was in their best interest. She had observed M.G. regularly and was not concerned about his relationship with Mother.

### H. Foster placement

All three children were placed together in the same foster home as of January 29, 2025, and remained there together. At the time of the September trial, after caring for the children for approximately eight months, S.P., the children's foster mom, testified that the children seemed "happy and growing and healthy." The trial court heard testimony from Leos, S.P., and the CASA that all the children were bonded with their foster family and that the family intended to adopt all three children.

V.A.R.C. was 13 months old in September, but S.P. testified that she was at about a seven- or eight-month age developmentally. One area in which V.A.R.C. continued to lag was mobility, which she lacked at the time of her removal. S.P. testified that V.A.R.C. was not crawling or able to stand and move as expected based on her age, but she had since received treatment and specialized orthotic devices to help her learn to walk.

V.A.R.C. was underweight at the time of removal as well as at the time of the September trial. S.P. testified that V.A.R.C. weighed 18 pounds, which was "a lot more" than at the time V.A.R.C. was placed in foster care. According to S.P., most babies around V.A.R.C.'s age wear a size five diaper, and V.A.R.C. was still wearing size two. V.A.R.C. was receiving speech, SST, and physical therapy twice a month; ongoing care from an ENT specialist for her ears; and care from a cardiologist. As of the September trial, V.A.R.C. was receiving care from a pediatrician who suspected she might have cerebral palsy. Leos testified that V.A.R.C.'s condition requires stability and consistency, and that she would have continuing medical needs for the foreseeable future. V.A.R.C.'s diagnosis was still pending at the time of the de novo hearing. S.P. testified that V.A.R.C. was bonded to her foster family, including their cat, which V.A.R.C. loves.

S.P. testified that C.J.C., the oldest child, had separation anxiety and was shy around new people. She described him as a "normal 4-year-old-boy" but noted that he tended to shut down when his environment became too loud or rambunctious. At the de novo hearing, Leos testified that C.J.C. was extremely bonded to his foster family, and although he did not speak clearly, he had never brought up or asked about his biological parents. According to Leos, C.J.C. referred to his foster parents as "mom" and "dad," and he enjoyed dressing up like his foster dad.

Leos testified that O.C.C. was also extremely bonded with his foster family. The only behavioral issue reported with O.C.C. was his sensitivity and reactions to inconvenience when

compared to other children his age. At the time of the de novo hearing, O.C.C. was attending regular play therapy.

The CASA testified that she was concerned that O.C.C. and C.J.C. would regress if they were returned to Mother. She also expressed concerns that V.A.R.C. would have a lag in health care due to the amount of therapies and appointments required to treat her conditions and Mother's instability and inability to provide transportation.

## I. Closing statements and final order

In closing at the September trial, the Department, the attorney ad litem for the children, and CASA all urged the court to terminate Mother's parental rights on the D and E grounds and to find that termination was in the best interest of the children. The Department relied on Mother's decision to remain with Father after the birth of each child despite the incidents of domestic violence in the home, and Mother's failure to protect herself or the children. Although Mother had completed some of the court-ordered services, the Department maintained that she had not learned from the services as evidenced by Mother's decision to enter and continue a relationship with M.G. against the recommendation of CASA and the Department.

The attorney ad litem for the children expressed concern about V.A.R.C.'s health problems and need for ongoing care as well as Mother's ability to put the children first in light of her pattern of entering relationships with multiple men during the pendency of case. The attorney ad litem was also concerned about Mother's inability to make changes during the pendency of the case while the children were not in the home.

In closing at the de novo hearing, the attorney ad litem for the children requested that Mother's rights be terminated and urged that it was in the children's best interest to remain in their current placement where they had been for almost a year. The Department also asked the court to

terminate Mother's rights on the D and E grounds. The Department acknowledged that Mother had completed most of her court-ordered services but not those the Department asked her to redo. The Department argued that Mother's decision to leave one relationship with domestic violence and immediately form a new relationship with another person with a history of domestic violence showed poor decision-making. Finally, the Department argued that none of the changes Mother made between the September trial and the de novo hearing were sufficient enough to warrant a different finding as to the best interest of the children.

Ordering termination of Mother's parental rights, the trial court found that clear and convincing evidence supported termination on D and E grounds and that termination was in the best interest of the children.

## III. Discussion

In a single issue, Mother challenges the legal and factual sufficiency of the evidence to support termination under the D and E grounds as well as best interest of the children.

### A. Standard of review and applicable law

The natural rights of a parent to her children are of constitutional magnitude, but not absolute. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). A court may order the termination of the parent-child relationship if it finds by clear and convincing evidence: (1) that the parent committed one or more of the acts set out in § 161.001(b) of the Texas Family Code; and (2) that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1)(A)–(U), (b)(2).

When reviewing the legal sufficiency of the evidence in a parental-rights termination appeal, we are to review "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the factfinder resolved

disputed facts in a manner that supports its findings if a reasonable factfinder could have done so. *See id*. We "should disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible" but should not disregard undisputed facts. *See id*.; *In re A.H.*, 679 S.W.3d 817, 827 (Tex. App.—El Paso 2023, pet. denied). The evidence is legally insufficient only if "no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true." *J.F.C.*, 96 S.W.3d at 266.

When reviewing the factual sufficiency of the evidence in a parental-rights termination appeal, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *J.F.C.*, 96 S.W.3d at 266 (quoting *C.H.*, 89 S.W.3d at 25). In making this determination, we must consider and weigh all the evidence, including any evidence that is disputed or conflicting. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). We must give due deference to the factfinder's findings, and we "must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing." *In re J.A.V.*, 632 S.W.3d 121, 130 (Tex. App—El Paso 2021, no pet.); *see In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.O.A.*, 283 S.W.3d at 345 (quoting *J.F.C.*, 96 S.W.3d at 266).

To terminate parental rights, the Department must (1) establish one or more of the statutory acts or omissions enumerated in § 161.001(b) of the Family Code and (2) prove that termination is in the child's best interest. *See In re A.L.H.*, 624 S.W.3d 47, 55 (Tex. App.—El Paso 2021, no pet.).

16

Both subsections (D) and (E) involve findings of endangerment to the child. *See* Tex. Fam. Code §§ 161.001(b)(1)(D), (1)(E); *A.L.H.*, 624 S.W.3d at 55–56. To "endanger" means "to expose to loss or injury" or "to jeopardize." *Interest of J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Although "endanger" means more than "a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," it does not require that the conduct be directed at the child or that the child actually suffer injury. *Id*. Each ground is discussed in turn below.

## B. Subsection (D)—Endangering environment

Under subsection (D), the Department must establish that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(D). Actual injury is not required; it is sufficient that the parent is aware of the potential dangers created by the environment and disregards the "real threat of injury or harm" to the child. *In re O.E.R.*, 573 S.W.3d 896, 906 (Tex. App.—El Paso 2019, no pet.) Endangerment can be shown by actions and omissions, and subsection (D) permits termination "because of a single act or omission." *Interest of R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied). Generally, the relevant time frame to determine endangerment under subsection (D) is while the children are residing in the home because "conditions or surroundings cannot endanger a child unless that child is exposed to them." *J.W.*, 645 S.W.3d at 749.

The child's living conditions and the conduct of parents or others in the home are relevant to the subsection (D) inquiry. *See Id*.; *A.H.*, 679 S.W.3d at 829. A parent's violent conduct can produce an endangering environment. *A.H.*, 679 S.W.3d at 829; *O.E.R.*, 573 S.W.3d at 905 ("Physical violence in the home leads to an unstable and unpredictable environment for children.").

17

"Domestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the child's presence, were not directed at the child, or did not cause actual injury to the child." *Interest of G.M.*, 649 S.W.3d 801, 809 (Tex. App.—El Paso 2022, no pet.) (citing *Boyd*, 727 S.W.2d at 533).

"A parent's decision to continue living with someone who has committed instances of domestic violence may support an endangerment finding under subsection (b)(1)(D)." *O.E.R.*, 573 S.W.3d at 905. "Similarly, a parent's failure to remove [herself] and [her] children from a violent relationship endangers the physical or emotional well-being of the children." *Interest of L.W.*, 609 S.W.3d 189, 200 (Tex. App.—Texarkana 2020, no pet.) (internal quotations omitted). "A mother unfortunate enough to have a husband from whom their children must be protected cannot invoke the marriage to exempt herself from the duty of protecting the children." *Interest of H.S.*, No. 95-0871, 2026 WL 1614496, at *11 (Tex. June 5, 2026); *see also J.W.*, 645 S.W.3d at 754 (Young, J., concurring) (emphasizing that we focus on the actions or omission of Mother alone and decline to uphold the termination of one parent's rights due to the other's failure).

Mother asserts that the evidence is both legally and factually insufficient to support termination under Subsection (D) because the record contains uncontroverted evidence that Mother is no longer in a relationship with Father. However, the relevant timeframe for an endangerment finding under subsection (D) is before removal, and it is undisputed that Mother did not end her years-long abusive relationship with Father until August 2025—well after the children were removed in October 2024. *J.W.*, 645 S.W.3d at 749.

The court heard evidence that Mother and Father had a history of domestic violence that began years earlier, when C.J.C. was one-year old. During the investigation, when Bustamante questioned Mother about the allegations of domestic violence, Mother denied any domestic

18

violence in the home. At the September trial, Father testified that there was no physical violence in the home, and Mother gave conflicting testimony about the severity and frequency. First, Mother testified that there was no domestic violence in the home, but she later testified that Father did physically assault her on multiple occasions.

In her conversations with Leos, once she admitted to their various problems, Mother identified Father's drinking as the primary reason for their disputes, which tended to spiral. Mother also conceded that her arguments and conflicts with Father were not safe for the children, stating "I knew that would impact my children and felt like that wouldn't be safe for them." She considered Father to have been a danger to her and the children throughout their entire relationship, indicating that Mother knew of and disregarded the danger to the children. In fact, at the September trial, Mother's testimony indicated that she understood that her relationship with Father was toxic and created an unsafe environment for her children, which was Mother's primary reason for ending their relationship. Although Mother was aware of these potential dangers, there is no evidence in the record that Mother attempted to remove the children from the violence occurring in the home or otherwise protect them from Father's drinking and outbursts. At both the September trial and the de novo hearing, the Department emphasized that Mother stayed in the home with Father and the children and never demonstrated that she attempted to protect the children from violence in the home.[5]

In addition to the testimony about domestic violence, the Department asserts that the trial court could have considered the conditions of the children and "observable signs of physical abuse

---

[5] Although the Texas Supreme Court has held that the Department may not demand divorce as a precondition for maintaining parental rights, the Department emphasized that Mother remained in the home with Father, *and* that she was not protective of the children. *See Interest of H.S.*, No. 95-0871, 2026 WL 1614496, at *11 (Tex. June 5, 2026). There is no evidence in the record that the Department suggested or otherwise conditioned Mother's parental rights on divorce or separation from Father.

and neglect" before their removal. Specifically, the Department points to (1) Bustamante's testimony that the children's diapers were overly soiled and her conclusion that the children had not been tended to in some time; (2) O.C.C.'s injuries, which included two black eyes and a bruised nose, and testimony that Mother provided multiple, inconsistent accounts explaining O.C.C. injuries and whether he was taken immediately for medical care; and (3) testimony from Leos and S.P. that V.A.R.C. was underweight and diagnosed with failure to thrive when she came into the Department's care.

The trial court heard uncontroverted testimony from both the CASA and Leos that the apartment from which the Department removed the children was safe and appropriate, and the CASA's testimony that the children were overly soiled and unattended to at the time of removal. While unsanitary conditions may constitute evidence of endangerment to a child's physical well-being, there is no evidence that Mother's home was inappropriate or unsafe while the children were in her care, nor was there evidence that the children were constantly in a soiled condition. *Contra*, *In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (finding that mother jeopardized children's health by allowing them to live in extraordinarily unsanitary conditions where evidence showed infestation and that the children often wore soiled diapers and clothes).

As to the Department's assertion that O.C.C.'s injuries speak to an endangering environment, severe unexplained injuries support a reasonable inference that a child's "caregivers knew of the injuries of their cause, and supports termination under subsection D." *Interest of E.A.R.*, 583 S.W.3d 898, 909 (Tex. App.—El Paso 2019, pet. denied). No medical records were introduced to show the extent or severity of O.C.C.'s injuries; instead, Bustamante and Leos testified to their observations. As to the explanation for the injuries, Mother provided the Department with inconsistent accounts of how he received them, claiming first that he fell inside

20

while playing, next that he fell outside on the sidewalk, and finally that he tripped over the couch and fell in the hallway.

As to the Department's assertion that V.A.R.C.'s diagnosis and weight provide evidence of an endangering environment, we disagree. Neglect of a child's medical needs can show endangerment of a child, but failure to provide or seek medical care involves an endangering course of conduct under subsection (E) and is thus relevant to the E-ground analysis below instead. *See Interest of J.D.G.*, 570 S.W.3d 839, 852 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (collecting cases).

In its termination order, the trial court stated that "part of this determination is based on [Mother's] lack of understanding concerning Domestic Violence and its impact on her children." Considering the trial court's statement and viewing the evidence in the light most favorable to the subsection (D) finding, we conclude that the trial court could have reasonably formed a firm belief or conviction that Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being. Tex. Fam. Code § 161.001(b)(D). Any disputed evidence that a reasonable factfinder could not have credited in favor of the subsection (D) finding is not so significant that the factfinder could not have reasonably formed a firm belief or conviction that the D ground was met. *See In re J.P.B.*, 108 S.W.3d 570, 573 (Tex. 2005) (per curiam) (requiring courts of appeals to defer to the trial court's credibility determinations so long as they are not unreasonable); *J.F.C.*, 96 S.W.3d at 266. Accordingly, we conclude that there is legally and factually sufficient evidence to support termination of Mother's parental rights under subsection (D).

We overrule the portion of Mother's issue addressing the D ground.

21

## C.  Subsection (E)—Endangering conduct

Under subsection (E), the Department must establish that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). Under this subsection, endangerment is established by evidence related to the parent's conduct, including acts and omissions. *See E.A.R.*, 583 S.W.3d at 911. The evidence must establish more than a single act or omission and requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id*. When considering course-of-conduct endangerment, we may consider conduct that occurs both before and after the child is removed by the Department. *Id*.

Domestic violence may support a finding of course-of-conduct endangerment. *Interest of D.J.W.*, 624 S.W.3d 60, 67 (Tex. App.—El Paso 2021, no pet.). Neglect of a child's medical needs, such as failure to provide or seek medical care, may also show an endangering course of conduct under subsection (E). *See J.D.G.*, 570 S.W.3d at 852 (collecting cases). Conduct that subjects a child to a life of uncertainty and instability, including instability in housing arrangements, endangers the physical and emotional well-being of a child. *Interest of U.G.G.*, 573 S.W.3d 391, 400 (Tex. App.—El Paso 2019, no pet.); *see J.A.V.*, 632 S.W.3d at 131–32. Failure to regularly visit or communicate with a child may endanger their emotional well-being. *Interest of A.R.O.*, 556 S.W.3d 903, 911 (Tex. App.—El Paso 2018, no pet.). The endangering conduct need not be directed toward the child. *See J.O.A.*, 283 S.W.3d at 345. Even if a parent makes improvements before trial, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices." *Id*. at 346.

22

Mother asserts the same challenge under subsection (E) as she did in subsection (D) above. She claims that the evidence is both legally and factually insufficient to support termination under subsection (E) because the record contains uncontroverted evidence that Mother is no longer in a relationship with Father.

Here the evidence showed that throughout the case, Mother was engaged in a course of conduct that endangered the physical or emotional well-being of the children. The trial court heard testimony from Leos that V.A.R.C. was diagnosed with failure to thrive, lacked mobility expected for a child of her age, and was underweight when she came into the Department's custody. Leos testified that she attempted to discuss V.A.R.C.'s failure to thrive with Mother and stated that Mother did not acknowledge the severity or the existence of the condition, instead blaming V.A.R.C.'s medical needs on being born early. The trial court also heard testimony that V.A.R.C. improved when she was placed in foster care; she gained weight and received treatment for her mobility impairments.

Throughout the case, Mother did not regularly visit or communicate with the children. Although the children's placement was a significant distance from Mother's home, she agreed to biweekly visitation, which she was adamant that she could attend. Despite the change to the schedule, the testimony at the September trial was that Mother's visitation was sporadic. Mother also engaged in a course of conduct that, if returned, would subject the children to a life of uncertainty and instability. During the pendency of the case, Mother lived in at least four different locations and struggled to maintain housing stability and find employment, which she found shortly before trial. The evidence was also uncontroverted that Mother was unable to maintain safe, appropriate, or sanitary conditions in the homes that Leos and the CASA visited. This remained true until the week of the September trial, at which time Leos visited the RV and testified

23

that the RV appeared clean and organized. However, this improvement made immediately before the final termination does not conclusively negate the probative value of the testimony that Mother frequently lived in unsanitary or inappropriate conditions.

Finally, the trial court heard evidence about domestic violence in Mother's life. First, Mother denied domestic violence during Bustamante's investigation. Mother eventually admitted to Leos that there was domestic violence in the home, but that she never sought a protective order or other help to protect the children. Mother testified at the September trial that she understood that Father's behavior and acts of violence in the home were unsafe for her children. Years after the behavior was prevalent in the home, Mother left Father because of it.

At the same time, she testified that within a week of leaving Father, she began a new relationship with M.G., a man who was convicted for assault family violence, furnishing alcohol to a minor, theft, unauthorized use of a vehicle, burglary of a vehicle, and "a number of various offenses." Mother testified at the September trial that she was willing to leave M.G., if that meant that the children would be returned to her. But at the de novo hearing, Mother testified that she planned to continue the relationship with M.G. and was pregnant with his child. Mother testified that she believed M.G. was a safe and appropriate person for the children even with his criminal history. Leos testified that she was concerned that Mother failed to exhibit changes to her behavior concerning the men in her life. The CASA testified that, because of Mother's new relationship with M.G. and his history of domestic violence, she had concerns for the children's safety.

Mother testified that she understood the Department wanted her to redo the domestic violence victim's services classes because the Department did not want her to leave the domestic violence in her relationship with Father and find herself in the same situation with M.G. Although the Department requested that Mother redo her parenting and domestic violence victim's services

24

classes, the Department did not seek an amended court-ordered service plan and Mother chose not to redo them. In closing at the de novo trial, the Department emphasized this point and argued that Mother had shown "questionable" decision-making.

Considering the evidence in the light most favorable to the subsection (E) finding, we conclude that the trial court could have reasonably formed a firm belief or conviction that Mother knowingly engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children. Tex. Fam. Code § 161.001(b)(E). Any disputed evidence that a reasonable factfinder could not have credited in favor of the subsection (E) finding was not significant enough to have prevented the trial court from forming a firm belief or conviction that the E ground was met. *J.F.C.*, 96 S.W.3d at 266. Accordingly, we conclude that there is legally and factually sufficient evidence to support termination of Mother's parental rights under subsection (E).

We overrule the portion of Mother's issue addressing the E ground.

### D. Best interest of the children

In addition to finding predicate ground for termination under subsection (b)(1), the factfinder must find that termination is in the child's best interest under subsection (b)(2) before terminating a person's parental rights. Tex. Fam. Code § 161.001(b)(2); *A.H.*, 679 S.W.3d at 831. Evidence supporting a finding under subsection (b)(1) is often relevant to the best interest inquiry of subsection (b)(2). *H.S.*, 2026 WL 1614496, at *13. But the two subsections are distinct, and subsection (b)(2) "imposes a separate best-interest finding requirement with independent force, and it is not automatically satisfied just because a parent committed one of the acts enumerated in subsection (b)(1)." *Id*.

There is a strong but rebuttable presumption that it is in the child's best interest to preserve the parent-child relationship. *A.H.*, 679 S.W.3d at 831. Even if a parent has committed an action described in (b)(1), remaining connected to the parent may be in the child's best interest especially if the parent is "on the path to rehabilitation and reunification." *H.S.*, 2026 WL 1614496, at *13. We analyze the child's best interest using the *Holley* factors:

> (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) (internal citations omitted). While no single factor is controlling, in some cases, evidence may weigh in favor of termination based on a single *Holley* factor. *A.H.*, 679 S.W.3d at 831.

Although Mother does not address each factor in her brief, she does argue that during the pendency of her case she completed parenting and domestic violence victim's services classes, never failed a drug test, obtained stable employment and had enough income to provide shelter and food for the children, showed that she had a support network of people willing to help her with the children, was no longer in a toxic relationship with Father or subject to domestic violence, and had taken good care of the children prior to removal. Mother also appears to argue that, to the extent the testimony showed her visitation was inadequate, she was not at fault for the extreme distance between where she lives and the children's placement. The Department responds that the children have emotional and physical needs now and in the future that Mother is ill equipped to

26

meet, that Mother's home was a continuing danger for the children, and the children are extremely bonded to their foster family, which has provided the stability and medical care that they need.

### (1) The children's desires

The first *Holley* factor considers the children's desires. "When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with the parent." *Id*. at 831–32 (quoting *In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)). Inconsistent visitation or visitation that does not nurture a strong bond between the parent and child bears on the first *Holley* factor. *O.E.R.*, 573 S.W.3d at 907.

At the time of the de novo hearing, V.A.R.C., O.C.C., and C.J.C. were one, two, and four years old, respectively. V.A.R.C. and O.C.C. were nonverbal, and C.J.C. was only partially verbal at the time of termination. The trial court heard evidence that C.J.C. never inquired about or mentioned his biological Mother. Further, there was testimony from S.P. and Leos that the children were bonded to the foster family. Leos testified that C.J.C. referred to his foster parents as "mom" and "dad," and he enjoyed dressing up like his foster dad. The Department introduced evidence that Mother's visitation was "sporadic." Her last in-person visit occurred more than two months before the September trial, and her last virtual visit occurred more than four months before the September trial. Additional evidence indicated that, because of the children's young age and lack of verbal communication skills, virtual visits were ineffective to nurture or maintain a bond with the children. This evidence for this factor supports the trial court's best interest finding. *See, e.g.*, *A.H.*, 679 S.W.3d at 832.

27

**(2) Current and future emotional and physical needs and danger to the same**

The second and third *Holley* factors consider the current and future emotional and physical needs of the children, and current and future emotional and physical danger. With regard to a child's physical and emotional needs, the need for permanence is a paramount consideration. *See K.A.C.*, 594 S.W.3d at 30. Young children are dependent on the adults in their lives to meet all of their physical and emotional needs. *See Interest of S.A.M.*, No. 04-18-00607-CV, 2019 WL 573469, at *4 (Tex. App.—San Antonio Feb. 13, 2019) (mem. op., not designated for publication). As to emotional and physical danger, "[a] fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent." *Interest of M.L.L.*, 573 S.W.3d 353, 365 (Tex. App.—El Paso 2019, no pet.).

Here, the record contains evidence that V.A.R.C.'s medical conditions require consistent and frequent medical care now and for the foreseeable future. V.A.R.C. was underweight and unable to move as expected when she was in Mother's care, but both conditions improved while in the care of the foster family. S.P. testified that although V.A.R.C. was still small, she had gained a significant amount of weight while in foster care and was learning to walk because she was receiving mobility treatment.

At the September trial, the CASA testified that she had serious concerns about the children's physical and emotional well-being and returning the children to Mother. She stated that she was concerned that O.C.C. and C.J.C. would regress in their speech, and that V.A.R.C. would not receive proper medical care due to Mother's housing and transportation instability. Leos also testified that she was concerned Mother had not learned from the parenting classes and other Department services because Mother was not able to provide consistent care for the children during

the visitation periods she sporadically attended. Leos questioned Mother's ability to make appropriate judgments about the people in her children's lives.

There was ample evidence that Mother struggled to maintain consistent housing, transportation, and employment during the pendency of the case. Mother resided in at least four different homes, many of which had serious sanitation and cleanliness concerns. Mother waited until the week of the September trial to address Leos's concerns about cleanliness and until the de novo trial to address the CASA's safety concerns about the RV. Mother testified that she had maintained stable employment and had people that were willing to help her take the children to school or appointments, if necessary. She also testified that she expected to have her own transportation soon after the de novo hearing.

The record contains evidence that Mother did not take steps to reduce the children's exposure to domestic violence, which she eventually acknowledged knowing was harmful to them. Mother herself gave conflicting testimony about Father's abuse and whether the children were present in the home at the time of his abuse. Although Mother ended her relationship with Father before the September trial, she immediately entered a new relationship with M.G., who testified that he has been convicted of multiple crimes, including assault family violence. Mother admitted that M.G.'s history of domestic violence was problematic, but she also testified that she had never experienced domestic violence during their six-month relationship.

Taken together, the children have significant emotional and physical needs due to their young age, and that V.A.R.C. has significant physical needs that will continue into the future. Throughout trial, Mother showed signs of instability and a lack of understanding about the children's needs. She delayed in finding stable and appropriate housing, and although Mother left Father, she immediately entered a new relationship with an individual who has a criminal history

29

that includes assault family violence. Although some evidence was disputed, a reasonable fact finder could have concluded that Mother is unable to meet the children's needs now and in the future. Therefore, we conclude that the evidence supports the trial court's best-interest finding under these factors.

### (3) Parental abilities and available programs

We next consider the fourth and fifth *Holley* factors together. The fourth factor considers the parenting abilities of the individual seeking custody, and the fifth factor examines the programs available to assist those individuals in promoting the child's best interest. "Adequate parenting skills may be demonstrated by a parent's actions in providing children with a safe physical home environment free from exposure to violence." *Id.* at 366. Although exposure to violence is relevant to our analysis, we proceed with caution when one parent's rights may be terminated based on their spouse's violence. *H.S.*, 2026 WL 1614496 at *9.

The Department provided Mother with multiple services to assist in promoting the best interest of the children. During the case, Mother completed all services except her individual counseling. Despite her participation and partial completion, the testimony at the September trial and at the de novo hearing showed that Mother struggled to understand the needs of the children and improve her parenting skills. Specifically, Mother continued to minimize the risks that her relationships with partners who have a history of domestic violence posed to her children. Mother testified that she understood the dangers that Father posed to the children during the September trial, but she denied that M.G. posed the same or similar risk despite his conviction for assault family violence. She claimed she would put her children first and end her relationship with M.G. if her children returned, but she later decided to continue the relationship, testifying that she was pregnant with M.G.'s child at the time of the de novo hearing. Based on Mother's conflicting

30

testimony about the risks of domestic violence and her own conduct and involvement with M.G., the trial court could have reasonably concluded that Mother failed to demonstrate an understanding of the parenting programs provided by the Department and questioned her parenting abilities. Accordingly, this factor supports the trial court's finding. *See In Interest of K-A.B.M.*, 551 S.W.3d 275, 289 (Tex. App.—El Paso 2018, no pet.) (holding that failure to complete services offered displayed parents' lack of ability to motivate themselves to improve their parenting abilities); *A.L.H.*, 624 S.W.3d at 59; *K.A.C.*, 594 S.W.3d at 375.

### (4) Plans for children and stability of home or proposed placement

The sixth and seventh *Holley* factors consider the plans for the children and the stability of the proposed placement. When considering the stability of the home or the proposed placement, we may "compare the parent's and the Department's plans for the [children] and determine whether the plans and expectations of each party are realistic or ill defined." Here, the Department placed the children with a foster family that plan to adopt all three children. The evidence showed that all three children were attending day care, receiving various therapies, bonded to their foster family, receiving medical care, and doing well in their placement.

In contrast, Mother's plan was ill-defined. She indicated only that her plan was for the children to return to her care and to live with her and the infant she was expecting, and that she intended to rely on members of her community to provide childcare. We conclude that the evidence for this factor supports the trial court's best-interest finding.

### (5) Acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one

The eighth *Holley* factor considers whether any act or omission of the parent may indicate that the existing parent-child relationship is not a proper one. Here, the evidence showed that Mother did not understand or appreciate the medical needs of V.A.R.C. before or after removal.

31

The evidence also showed that Mother endangered the children by failing to protect them from domestic violence in the home. *A.H.*, 679 S.W.3d at 829. Mother also made the decision to enter a relationship with M.G., a man with a criminal history for assault family violence, while the termination case was pending. Based on this evidence, the trial court could have found that the existing parent-child relationship was not a proper one.

### (6) Any excuse for the acts or omissions of the parent

The ninth *Holley* factor considers any excuse for the acts or omissions of the parent. The Department placed the children at a significant distance from Mother.[6] However, she does not claim that her failure to attend regular visitation was not an intentional act or omission or due to the distance from her home to the children's placement. Instead, Mother states in her brief that "[t]here was criticism in the lack of visitation but as testimony clearly showed, the children were placed several hours away from [her] home and she did visit them in July before the final hearing." There is no evidence in the record that Mother requested transportation help or other aid from the Department to facilitate in-person visitation. Instead, the only evidence shows that the parties agreed to change the visitation schedule from weekly to biweekly due to the significant distance, and Mother was adamant that she could attend on that schedule. The record contains some evidence that Mother requested additional virtual visitation, which was denied by the Department due to the children's young age. However, Mother does not complain about a lack of virtual visitation in her brief. Mother's lack of visitation prior to termination prevented her from developing a strong and proper relationship with the children. *O.E.R.*, 573 S.W.3d at 907. While we recognize that the

---

[6] The record indicates that, except for one month spent in the Austin area, Mother resided in Monahans throughout the pendency of this case. We take judicial notice that the distance between Monahans and the visitation center in Centerville is approximately 450 miles. *See In re A.D.B.*, No. 11-11-00117-CV, 2012 WL 2988815, at *5 (Tex. App.—Eastland July 19, 2012, no pet.) (mem. op.) (per curiam) (taking judicial notice of the distance between where the parents resided and where the child was placed in foster care).

significant distance involved posed a hardship for Mother, we conclude that this factor supports the trial court's finding.

### (7) The sum of the factors

Considering the evidence bearing on the *Holley* factors in the light most favorable to the trial court's finding, we conclude that the trial court could have reached a firm conviction that termination of Mother's parental rights was in the children's best interest. *J.F.C.*, 96 S.W.3d at 266. Any disputed evidence that a reasonable factfinder could not have credited in favor of the best-interest finding was not significant enough to have prevented the trial court from forming a firm belief or conviction that termination was in the children's best interest. *Id*. Accordingly, we find there is legally and factually sufficient evidence to support the trial court's best-interest finding.

We overrule the portion of Mother's issue regarding the children's best interest.

## IV. CONCLUSION

We affirm the judgment of the trial court.


LISA J. SOTO, Justice

July 10, 2026

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

33